Affirmed and Memorandum Opinion filed December 3, 2009.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-08-00828-CR

___________________

 

Clifton Randall Bryan, Appellant

 

V.

 

The State of Texas, Appellee



 



 

On
Appeal from the 178th District Court

Harris County,
Texas



Trial Court Cause No. 1126811

 



 

 

MEMORANDUM OPINION

            This is an appeal from a capital
murder conviction.  A jury found appellant, Clifton Randall Bryan, guilty of
murder in the course of committing a robbery.  See Tex. Penal Code. §§
19.02(b)(1), 19.03(a)(2) (Vernon 2009).  The trial court assessed punishment at
incarceration for life in the Texas Department of Criminal Justice,
Institutional Division.  In two issues, appellant challenges the legal and
factual sufficiency of the evidence.  We affirm.

 

Factual and Procedural Background

I.         Ramada Inn Shooting and Dyna Street Robbery 

            At 11 p.m. October 6, 2004, Robert Gutzman was
shot in the parking lot of a Ramada Inn motel.  Gutzman ran into the lobby of
the motel where he encountered Nicholas Thorton, a security officer at the
motel.  Gutzman told Thorton that he had been shot.  Thorton immediately ran
outside in an attempt to locate the shooter, but there was no one in the
parking lot or on the street.  Meanwhile, Gutzman collapsed in the lobby of the
motel.  Thorton ran back inside to help Gutzman and asked him what happened. 
Gutzman said he was in the parking lot, locking up his gun in the back of his
truck, and he was robbed.  He said the robber asked him for his wallet and
Gutzman refused.  Gutzman lamented on the fact that he should not have
refused.  Gutzman told Thorton the robber was a white male wearing an “HPD” hat. 
Gutzman said he thought the man had shot him with a silver semi-automatic gun. 
Additionally, Gutzman indicated there was more than one person involved. 
Gutzman told Thorton to tell his wife that he loved her; these were his final
words.

            Shortly before or after Gutzman was shot, a couple
was robbed on Dyna Street, only a few streets over from the Ramada Inn.  The
couple described the first man as a white male between thirty and forty years
of age, standing six feet in height, and wearing an “HPD” cap.  They said he
used a silver revolver to hold them up.  The couple told Harris County
Sherriff’s Office investigators the other male was Hispanic, was approximately
five feet four inches in tall, had bushy hair, and was in his mid-thirties. 
The couple gave their description to a sketch artist who developed a composite
sketch of the robbers.  The Harris County Sherriff’s Office ran the sketches on
the local news and hung flyers around the area.  

II.        The Allen Brothers  

            Eventually, the Harris County Sherriff’s Office
received an anonymous tip from a woman who said the sketches resembled her
grandson’s father and his brother.  The woman identified the men as William and
Blake Allen.  Sergeant Yvonne Cooper of the Harris County’s Sheriff’s Office located
pictures of William and Blake Allen in the Harris County database and put
together a photospread.  Sergeant Cooper showed the photospread to the Dyna
Street couple.  The wife identified Blake Allen as the man who robbed her, but
did not identify William.  The husband identified both Blake and William Allen
as the men who robbed him.  On November 1, 2004, Sergeant Cooper arrested Blake
and William Allen and took them to the homicide office.  They also brought in Michelle
Moya, the mother of William’s son, for questioning.  Michelle was not a
suspect.  They arrived at the homicide office around 6 p.m.  Harris County
detectives took Blake, William, and Michelle into separate rooms for
questioning about the Dyna Street robbery and the Ramada Inn shooting.  At
approximately 11 p.m., Blake Allen gave a confession to Harris County Detective
Hoffman[1]
regarding both incidents.  However, in his confession Blake Allen inculpated a
man who detectives determined was incarcerated on the date of the shooting. 
The detectives confronted Blake Allen with this information and he gave another
statement to the detectives.  This time, Blake inculpated another man, a person
feared by Blake.  The police eventually discovered this man also could not have
been responsible for the shooting or robberies.

            Blake and William Allen were both charged for
Gutzman’s death.  However, the charges against William were dropped soon after
because the only evidence against him was his brother’s uncorroborated
statement.  Blake was found incompetent to stand trial.  Blake was sent to Vernon
State Hospital and upon his return he was deemed competent to stand trial. 
But, before going to trial against Blake, Assistant District Attorney Tammy
Thomas began further investigation of the charges against Blake.  Eventually, Thomas
decided the case against Blake was weak and the District Attorney dismissed all
charges against him.  Blake had been incarcerated for two years awaiting his
trial.

            The Harris County Sherriff’s Office continued its
investigation into the death of Robert Gutzman.  Over time, the police
discovered evidence leading them to appellant.   Appellant was arrested and
charged with the capital murder of Robert Gutzman.

III.      The State’s Case in Chief  

            A.        Nancy Corral 

            The first witness called by the State was Nancy
Corral.  At the time of trial, Corral was incarcerated for robbery by threat,
an incident unrelated to the one at issue in this case.  Corral testified that
on October 6, 2004 she was living in a mobile home with her ex-brother-in-law,
Billy Joe Garza.  Appellant owned the trailer park where Garza’s mobile home
was located.  Garza worked as a maintenance man for appellant.  Corral told the
jury she began taking drugs and drinking alcohol in the morning on October 6,
2004.  She continued to drink and take drugs throughout the day.  Sometime in
the evening, she went to a nearby apartment complex on Dyna Street and Goodsend
Street.  Corral testified she consumed approximately twelve beers, drank one
margarita, ingested approximately five xanax pills, and smoked marijuana over
the course of the day.  Later that evening, Corral called appellant’s cellular
phone and asked him if he or Garza could pick her up from the apartment
complex.  Appellant, Garza, and Garza’s son, Edward Torres, arrived at the
apartment complex in a red truck.  Garza was driving the truck, which was owned
by appellant but used frequently by Garza in the course of his work as a maintenance
man for appellant.  Corral got in the truck and they all went out to eat at a local
restaurant.  Corral testified that either Garza or appellant wore a hat with an
“HPD” badge in the middle of it.  

            On the way home from the restaurant, appellant saw
a man in the back of a truck at the Ramada Inn motel parking lot.  Appellant
told Garza to pull the truck over “to get him.”  Garza pulled the truck over
and parked it next to the man in the truck.  Corral testified that appellant
got out of the truck and pointed a silver revolver with a wood grain handle at
the man.  Corral stayed in the truck, but she observed appellant grabbing at
the man’s watch and appearing to make demands of the man.  The man refused and
appellant shot him.  Appellant jumped in the truck and Garza drove off.  Corral
saw the man run into the lobby of the Ramada Inn.  Corral testified that
appellant’s hat flew out of the window as they drove off.  Garza and appellant returned
Corral and ten-year-old Torres to the mobile home.  Corral did not know what
appellant and Garza did after they dropped her off, nor did she know when Garza
returned to the mobile home.  

            Corral was unsure of when she last saw appellant.
 Corral testified the last time she saw Billy Joe was in 2004 and the last time
she saw Ed Torres was before she was incarcerated on January 31, 2006.  She
also testified that she has never spoken to Garza or Torres about the incident
that occurred on October 6, 2004.     

            On cross-examination, the defense confronted Corral
with numerous inconsistencies between her trial testimony and what she earlier
told investigators and prosecutor Tammy Thomas.  Corral admitted to previously
lying about whether Torres was in the truck at the time of the incident.  She
testified that she was trying to protect him.  Additionally, the defense
questioned Corral about the statement she gave Thomas when she said the
distance between appellant and the man he shot was between six and fifteen
feet.  At trial, Corral testified the distance was much less than six feet.  Corral
testified that she did not see Garza get out of the truck, but that he could
have exited without her noticing because she was so focused on appellant.  She
also admitted to frequent and long blackouts while drinking alcohol and using
drugs.  Corral told the jury that she blacked out after Garza and appellant
returned her to the mobile home.  

            Defense counsel also asked Corral whether she
remembered telling detectives about another robbery incident involving Garza. 
She did not remember much about this incident, except that they obtained a
backpack with marijuana inside.  She could not conclusively state whether
appellant was present during this robbery or whether this robbery occurred on
the same night as the Ramada Inn shooting.

            B.        Edward Torres

            Next, the State called Ed Torres as a
witness.  At the time of trial Torres was fourteen years old; at the time of
the incident he was ten.  Torres testified the last time he saw his father,
Billy Joe Garza, was approximately nine months earlier and before that, he had
not seen him in approximately four years.  The State asked Torres whether he
remembered the time he saw a man get shot.  Torres replied that he did remember
and confirmed it was the only time he ever saw a man get shot.  Torres told the
jury that on that day he was in a red truck with his father and appellant. 
Appellant was wearing a “police hat.”  He testified they went to an apartment
complex to pick up Corral and then they went out for dinner.  After they
finished eating, they went driving around while Torres played his PlayStation
Portable in the backseat.  Torres testified they saw a man walking by a motel
and they pulled into the motel’s parking lot.  Torres continued playing his
game and then noticed that his father and appellant had gotten out of the
truck.  Garza and appellant were both pointing guns at the man in the parking
lot, indicating they wanted the man’s watch.  The man refused.  Garza got back
in the truck.  Appellant shot the man in the left shoulder one time with a long
silver gun. The man began bleeding profusely and ran toward the motel doors. 
Appellant jumped back into the truck and Garza “burned out” of the parking lot.

            Torres told the jury that after the shooting, Garza
and appellant returned Torres and Corral to the mobile home.  Torres said he
was scared because he had never seen anyone shot before.  Torres and Corral never
spoke about the incident.  The next day, Torres’s mother, Rebecca Torres,
picked him up from Garza’s mobile home.  Torres relayed to his mother what had
taken place the previous night.  

            Torres testified that when he was in fifth grade
investigators and a woman from the district attorney’s office came by his
school and asked him about what happened the night he saw someone get shot.  Except
for his mother and the investigators that came to his school, Torres testified
that he did not talk to anyone else about the incident.  Specifically, he did
not talk about the incident with appellant, Garza, or Corral. 

            The defense’s cross-examination of Torres called
into question his mental capacity and his ability to remember what happened on
the night of the shooting.  The defense pointed out differences between what Torres
told the assistant district attorney who visited him at school and what he said
while testifying for the State.  The defense asked Torres whether he was lying
then or now.  Torres claimed he did not remember everything he told the
prosecutor when she visited him at school.  Later during trial, the State
stipulated that Torres had been placed on juvenile probation on March 25, 2008,
for the felony offense of burglary of a building.  

            C.        Dr. Mary Lyn Anzalone

            Dr. Anzalone is an assistant medical
examiner for the Harris County Medical Examiner’s Office.  Dr. Anzalone
testified she conducted the autopsy on Gutzman’s body.  According to her
testimony, the “stippling” marks left around the entrance wound of the bullet
indicate Gutzman’s shooter was likely within three or four feet of Gutzman. 
Additionally, Dr. Anzalone testified the track of the bullet would not be
consistent with someone standing in the bed of a truck.  However, she testified
the track of the bullet could be consistent with someone bending over in the
bed of a truck.      

            D.        Lisa Brewer

            Lisa Brewer testified for the State.  Brewer
told the jury that on October 13, 2004 she pawned two of appellant’s guns under
her name.  The State entered into evidence the pawn slip information containing
her name.  Brewer further testified that on January 5, 2005 she retrieved the
guns from the pawn shop on appellant’s behalf.  She explained that appellant
met her at the pawn shop and paid for the two guns to be returned.  On cross-examination,
Brewer confirmed that she and appellant were married on November 19, 2004.  

            E.        Jill Dupree 

            Next, the State called Jill Dupree, a
firearm and toolmark examiner for the Harris County Sheriff’s Department.  Dupree
testified she examined the bullet that killed Gutzman.  She determined that it
could have been fired by a Smith and Wesson, a Ruger, or a Taurus revolver,
either a .38 special or a .357 magnum.  She concluded that the bullet could not
have been fired by a semi-automatic gun.  The State presented Dupree with the
pawn slip previously entered into evidence.  The pawn slip listed one of the
pawned guns as a Smith and Wesson Revolver, model 686-2, .357 magnum.  Dupree
testified this type of weapon could have been used to fire the fatal bullet. 

            F.        Tammy Thomas

            The State called assistant district attorney
Tammy Thomas to testify about dropping charges against Blake Allen.  Thomas testified
that after talking with Blake and William Allen’s lawyers about their defense
strategies, she decided to investigate further.  She obtained evidence leading
her to appellant and decided to interview him.  During her interview with appellant
she established that he owned a red Dodge extended cab truck.  Additionally,
the purchase order agreement for the truck contained the signatures of Nancy
Corral, Rebecca Torres, and Billy Joe Garza as witnesses.  Moreover, during Thomas’s
trial preparation, she noticed that Billy Joe Garza, who was in prison on
unrelated charges, had been bench warranted to Houston—indicating the defense
was going to call him to testify in Blake Allen’s trial.  Thomas visited Garza
in prison.  After receiving new information about the case from Garza, Thomas
decided to interview Edward Torres at his school.  Directly after visiting
Torres at school, she found Nancy Corral at her probation office, where she
interviewed Corral.  At some point before talking to Torres and Corral, but
after meeting with the Allen brothers’ attorneys, Thomas met with Rebecca
Torres, Edward Torres’s mother.  Rebecca Torres relayed to Thomas the story
young Edward Torres told her about the Ramada Inn shooting.  After conducting
these interviews, Thomas decided to dismiss charges against Blake Allen and
start a new investigation against appellant.    

            G.        Sue Gutzman

            Sue Gutzman is the wife of the late Robert
Gutzman.  She testified her husband was staying at the Ramada Inn on a business
trip to Houston.  During cross-examination, the defense confirmed that Robert
Gutzman was diabetic and always carried his “diabetic pack” including a blood
pressure machine, a glucosometer and needles in a black fanny pack.  On
November 7, 2004 Mrs. Gutzman testified that she received a phone call from a
detective asking her whether the black fanny pack had been returned.  Mrs.
Gutzman told the detective that she had not yet received any of her husband’s
belongings.  Mrs. Gutzman ultimately recovered her husband’s belongings a month
later, but did not receive the black fanny pack. 

            H.        Deputy Pete Galvan

            The State’s final witness was Harris
County Deputy Pete Galvan.  Deputy Galvan is the custodian of records for phone
calls made out of the Harris County jail.  Deputy Galvan authenticated a phone
call made by appellant to his mother while appellant was in custody.  The State
played a recording of the conversation in front of the jury.  During this phone
conversation, which played a warning to appellant that the conversation would
be recorded, appellant indicated to his mother that he had seen Garza in the
county jail and had tried to communicate with him.  Appellant said he asked
Garza whether he was “talking”, Garza said no, and appellant said he wasn’t
“talking” either.  Then appellant told his mother that Garza would be calling
her because appellant needed her to “fill him [Garza] in on some stuff.” 
Appellant asked his mother to get out a pen and paper and write down notes to
tell Garza.  First, he wanted her to tell Garza that “they” have two
statements, one from Corral and one from Garza.  Next, he said “they” can’t see
who is in the truck, so “they” don’t know it’s him.  Additionally, appellant
wanted his mother to tell Garza not to conclusively identify appellant in court,
if Garza testified.  Finally, appellant said to his mother “right now, if we
were to go to court there’s no way that I could lose.”    

IV.      The Defense

            A.        Sergeant Yvonne Cooper

            On October 6, 2004, Sergeant Cooper was
called to the scene of the Ramada Inn shooting.  Shortly thereafter, she
learned of a nearby robbery on Dyna Street, in which the complainants gave a
similar description of the suspects as the one given by Robert Gutzman before
he died.  Sergeant Cooper testified it was unclear whether the robbery or the
shooting occurred first.  After refreshing her memory with the police report,
Sergeant Cooper testified the property stolen in the Dyna Street robbery
consisted of: a backpack purse, a lunch purse, driver’s license, diabetic
medication, makeup, two dollars, CDs, a CD player, and the male’s wallet.  

            Sergeant Cooper explained that after receiving an
anonymous tip she arrested Blake and William Allen for the Dyna Street Robbery
and the Ramada Inn shooting.  The suspects were taken to the homicide office
where they were interviewed in separate rooms. Sergeant Cooper testified that,
according to normal interviewing procedures, the detectives conferred with each
other outside the interview rooms to exchange information they learned from the
suspects.  During the State’s cross-examination, Sergeant Cooper confirmed it
is an accepted interview technique to question people about specific
information regarding a crime to get their response.  The State implied that
evidence may have been suggested to Blake Allen, which was subsequently
incorporated in his confession.  Sergeant Cooper did not directly confirm these
implications; she merely testified that the investigations were conducted
according to normal police procedure.  Furthermore, she said Detective Hoffman
did not have a reputation for cutting corners with his investigation
practices.    

                        B.        Blake Allen

            The defense called Blake Allen as its second
witness.  At best, Blake Allen was uncooperative.  Blake Allen testified that
he did not remember any of the events surrounding his incarceration or his
statements.  Eventually, Blake admitted he remembered the police officers
giving him a piece of paper and telling him that if he signed it, he could go
home.  Blake said he signed it only because he thought he could go home.  Blake
also testified that he was intoxicated at the time he was arrested and
interviewed.  Blake told the jury that every single night of his life he has
been in bed asleep at his mother’s house by 10 p.m.  While Blake testified, the
defense held up the composite picture drawn by the sketch artist in order to
show the similarities between the picture and Blake Allen.  The defense suggested
that Blake Allen was responsible for the murder and the charges against him
should never have been dismissed.  The State’s theory implied that
investigators fed Blake Allen the information he incorporated in his statement
and that Blake Allen was completely uninvolved in the Ramada Inn shooting.              

Discussion

            Appellant contends the evidence presented at
trial is not legally or factually sufficient to support his capital murder
conviction.  Specifically, appellant focuses on (1) whether Nancy Corral’s
testimony must be corroborated because she was an accomplice, (2) evidence,
specifically the diabetic fanny pack, known of by Blake Allen, which could have
only been known to the shooter, and (3) the credibility of Nancy Corral and
Edward Torres.   

I.         Standard of Review

            In a legal sufficiency review, we view all
the evidence in the light most favorable to the verdict and determine whether
any rational trier of fact could have found the essential elements of the crime
beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99
S.Ct. 2781, 2789, 61 L. Ed. 2d 569 (1979); Salinas v. State, 163 S.W.3d
734, 737 (Tex. Crim. App. 2005).  The jury, as the sole judge of the
credibility of the witnesses, is free to believe or disbelieve all or part of a
witness’ testimony.  Jones v. State, 984 S.W.2d 254, 257 (Tex. Crim.
App. 1998).  The jury may reasonably infer facts from the evidence presented,
credit the witnesses it chooses to, disbelieve any or all of the evidence or
testimony proffered, and weigh the evidence as it sees fit.  Sharp v. State,
707 S.W.2d 611, 614 (Tex. Crim. App. 1986).  Reconciliation of conflicts in the
evidence is within the jury’s discretion, and such conflicts alone will not
call for reversal if there is enough credible evidence to support a
conviction.  Losada v. State, 721 S.W.2d 305, 309 (Tex. Crim. App.
1986).  An appellate court may not re-evaluate the weight and credibility of
the evidence produced at trial and in so doing substitute its judgment for that
of the fact finder.  King v. State, 29 S.W.3d 556, 562 (Tex. Crim. App.
2000).  Inconsistencies in the evidence are resolved in favor of the verdict.  Curry
v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).  We do not engage in a
second evaluation of the weight and credibility of the evidence, but only
ensure the jury reached a rational decision.  Muniz v. State, 851 S.W.2d
238, 246 (Tex. Crim. App. 1993); Harris v. State, 164 S.W.3d 775, 784
(Tex. App.—Houston [14th Dist.] 2005, pet. ref’d).

            In a factual sufficiency review, we consider all
the evidence in a neutral light.  Prible v. State, 175 S.W.3d 724, 730–31
(Tex. Crim. App. 2005).  The evidence may be factually insufficient in two
ways.  Id. at 731.  First, when considered by itself, the evidence
supporting the verdict may be so weak that the verdict is clearly wrong and
manifestly unjust.  Id.  Second, where the evidence both supports and
contradicts the verdict, the contrary evidence may be strong enough that the
beyond-a-reasonable doubt standard could not have been met.  Id.  In
conducting a factual sufficiency review, we must employ appropriate deference
so we do not substitute our judgment for that of the fact finder.  Jones v.
State, 944 S.W.2d 642, 648 (Tex. Crim. App. 1996).  Our analysis must
consider the evidence appellant claims is most important in allegedly
undermining the jury’s verdict.  Sims v. State, 99 S.W.3d 600, 603 (Tex.
Crim. App. 2003).

II.        Analysis

            A.        Is Nancy Corral an Accomplice? 

            Before we determine whether the evidence is
sufficient to support appellant’s conviction, we must address whether Nancy
Corral is an accomplice.  A conviction cannot be had upon the testimony of an
accomplice unless corroborated by other evidence tending to connect the
defendant with the offense committed; and the corroboration is not sufficient if
it merely shows the commission of the offense.  Code Crim. Proc. Ann. art.
38.14 (Vernon 2009).

            An accomplice is an individual who participates
with a defendant before, during, or after the commission of the crime and acts
with the requisite culpable mental state.  Cocke v. State, 201 S.W.3d
744, 748 (Tex. Crim. App. 2006).  Participation requires an affirmative act
that promotes the commission of the offense with which the defendant is
charged.  Id.  An individual is an accomplice if he, like the defendant,
could be prosecuted for the offense or a lesser-included offense.  Id. 
There must exist evidence sufficient to connect the alleged accomplice to the
criminal offense as a “blameworthy participant,” but whether the alleged
accomplice-witness is actually charged or prosecuted for his participation is
irrelevant.  Id.  Mere presence at a crime scene does not make an
individual an accomplice, nor is an individual an accomplice merely because he
has knowledge about a crime and fails to disclose that knowledge.  Id.

            Appellant contends Nancy Corral was an accomplice
because (1) she was present in the car with appellant and Billy Joe Garza when
the crime occurred, (2) there was evidence she was present when other robberies
occurred while Billy Joe Garza and Edward Torres were present, and (3) she made
efforts to conceal the crime because she did not reveal its existence until
confronted two years later.  We disagree.  The evidence shows Nancy Corral was
only along for the ride when appellant shot Gutzman.  Corral called appellant
and Garza for a ride because she was too intoxicated to drive herself.  The
evidence indicates they decided to grab something to eat and then head home. 
However, according to Corral and Torres, on the way home, appellant decided to
rob a man in a Ramada Inn parking lot.  Corral did not get out the car, nor did
she offer any input on how to accomplish the robbery and subsequent murder.  As
stated above, mere presence at a crime scene does not make an individual an
accomplice, nor does failing to disclose knowledge about a crime make one an
accomplice.  See id.  Additionally, there is no evidence of an
affirmative act on Corral’s part assisting in the commission of the crime.  See
Hall v. State, 937 S.W.2d 580, 584 (Tex. App.—Texarkana 1996, writ ref’d).
 Because the evidence establishes Nancy Corral was not an accomplice, the
State was not required to corroborate her testimony.  See Code Crim.
Proc. Ann. art 38.14 (Vernon 2009).  

            B.        Is the Evidence Legally and
Factually Sufficient to Support Appellant’s                        Conviction?

            A
person commits the offense of capital murder if she intentionally commits
murder in the course of committing or attempting to commit robbery.  Tex. Penal
Code Ann. § 19.03(a)(2) (Vernon 2009).  A person commits murder if he
intentionally or knowingly causes the death of an individual.  Id. at §
19.02(b)(1) (Vernon 2009).  A person commits a robbery if, in the course of
committing theft, and with the intent to obtain or maintain control of the
property, he intentionally or knowingly threatens or places another in fear of
imminent bodily injury or death.  Id. at § 29.02(a)(2) (Vernon 2009).

            Appellant challenges the credibility of the two
eyewitnesses, Nancy Corral and Ed Torres.  The record demonstrates that Nancy
Corral was heavily intoxicated at the time of the alleged offense; the jury nonetheless
found appellant guilty.  Furthermore, because the defense established that Corral
had changed her story about the incident over time, the jury was able to take
this into consideration.  The jury still found appellant guilty.  The defense
called into question Torres’s mental acumen and character, and pointed out the
differences between Torres’s testimony and the version of events he described to
investigators; the jury still found appellant guilty.  The evaluation of the
witnesses’ credibility and demeanor is within the sole province of the jury.  Cain
v. State, 958 S.W.2d 404, 408–09 (Tex. Crim. App. 1997).  The Court of
Criminal Appeals has specifically stated intoxication of a victim-witness bears
on credibility, which is a matter reserved for the jury.  See id. at
409.  We must give deference to the jury’s findings on the credibility of Nancy
Corral and Edward Torres.  

            Finally, appellant argues Blake Allen’s statement
indicating he had knowledge of a piece of evidence—the diabetic pack[2]— unknown to anyone
but the shooter and the victim is dispositive of appellant’s guilt.  After a
careful evaluation of the record, it is not conclusively established that only
the shooter and the victim knew about this piece of evidence.  Sergeant Yvonne
Cooper testified that the property recovered from the Dyna Street robbery
included diabetic medication.  She testified to this after refreshing her memory
from her police report.  There was no chain of custody established nor was the
diabetic pack introduced into evidence.  It is conceivable that the jury
believed the diabetic pack was taken from Gutzman and then stashed with the
property stolen from the couple on Dyna Street.  There is no testimony from the
Dyna Street couple that a diabetic pack was stolen from them.  Therefore,
Sergeant Cooper knew about the diabetic pack, which could have been either
Gutzman’s or the couple’s, when she was involved in the interrogation of the
Allen Brothers.  As stated above, Sergeant Cooper testified the detectives
discussed matters during the interrogation of the Allen Brothers. 
Additionally, she testified that police commonly inform suspects about evidence
found in the course of the investigation in order to get the suspects to talk. 
The jurors reasonably could have concluded that the late Detective Hoffman may
have mentioned the diabetic pack in the interrogation of Blake Allen.  It is
also reasonable for the jurors to have concluded that much of Blake Allen’s statement
was false in light of the fact he inculpated two different persons, both
subsequently found to have not been involved.

            After reviewing the evidence set forth above in a
light most favorable to the verdict, we hold the evidence is legally sufficient
to convict appellant of capital murder.  

            Moreover, after giving deference to the jury’s
evaluation of credibility and demeanor of the witnesses, we do not find the
evidence so weak that it would be manifestly unjust to convict appellant of
capital murder.  Nor, is the contrary evidence so overwhelming that the beyond
a reasonable doubt standard could not have been met.  Specifically, there are
two eye witnesses who testified in detail to seeing appellant shoot Gutzman
with a silver gun.  Furthermore, Lisa Brewer’s testimony connects appellant with
a gun that could have fired the fatal shot.  Additionally, the fact that
appellant had Lisa Brewer pawn two of his guns, one of which was a type that
could have been the murder weapon, under her name six days after the murder could
have led a reasonable juror to conclude this indicated an attempt by appellant
to conceal evidence of his guilt.  The only substantial contrary evidence
presented by the defense was the statement of Blake Allen, which the jury
reasonably chose not to believe.  Accordingly, after viewing the evidence in a
neutral light and giving deference to the jury’s evaluation of credibility and
demeanor, we hold the evidence is factually sufficient to support appellant’s
capital murder conviction.    

Conclusion

            Having overruled both of appellant’s issues on
appeal, we affirm the judgment of the trial court.  

 

                                                                                    

                                                                        /s/        John
S. Anderson

                                                                                    Justice

 

 

 

Panel consists of Chief
Justice Hedges and Justices Anderson and Boyce.

Do
Not Publish — Tex. R. App. P. 47.2(b).









[1] Detective Hoffman was
deceased at the time of trial.





[2] Or the “flaming fanny
pack” as the defense referred to it in its closing argument.